UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

CURTIS G. PHARR,

                    Plaintiff,

         -against-

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                Defendant.
-----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**13-CV-5749 (NGG)**

      Plaintiff Curtis G. Pharr brings this action pursuant to 42 U.S.C § 405(g), seeking judicial review of the decision of the Social Security Administration (the "SSA") that he only was disabled for a closed period, from September 6, 2007, through January 10, 2011, and therefore is not entitled to Social Security Disability Insurance benefits ("SSDI") after January 10, 2011. (See Compl. (Dkt. 1) ¶ 1.) Plaintiff argues that the SSA erred in denying continued benefits by: (1) failing to provide substantial evidence for finding that as of January 11, 2011, Plaintiff's impairment no longer met or equaled the requirements of a listed impairment in the SSA regulations; (2) finding that Plaintiff had the residual functional capacity for the full range of sedentary work; (3) improperly assessing Plaintiff's credibility; and (4) failing to sustain its burden of showing that there is work in the national economy that Plaintiff can perform. (See Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mem.") (Dkt. 32) at 10-25.) Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security (the "Comissioner"), has filed a motion, and Plaintiff has filed a cross-motion, for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s Not. of Mot. (Dkt. 29); Pl.'s Not. of Mot. (Dkt. 31).) Plaintiff and Defendant have also submitted memoranda of law in further support of

their motions. (Mem. of Law in Further Supp. of Def.'s Mot. ("Def.'s Mem.") (Dkt. 33); Pl.'s Br. in Reply to Def.'s Mem. ("Pl.'s Reply") (Dkt. 34).) For the reasons set forth below, the Commissioner's Motion is DENIED, Plaintiff's Cross-Motion is GRANTED, and this case is REMANDED to the SSA for further evaluation.

## I.  BACKGROUND

Plaintiff was born on September 10, 1963; he is currently 52 years old. (Administrative R. ("R.") (Dkt. 5) at 123.) He is a high school graduate. (Id. at 56.) From 1988 to 2006, Plaintiff worked as a bus driver for the Manhattan and Bronx Surface Transit Operating Authority. (Id. at 133-37.) From 2006 to September 6, 2007, he worked as a garbage collector and truck driver for Royal Waste Services. (Id.) On September 6, 2007, Plaintiff was involved in a car accident while at work. (Id. at 48.) He was transported to Jamaica Hospital where he was treated for injuries to his left hip and foot. (Id. at 187-211.) Plaintiff was 43 years old at the time of the accident. (Id. at 197.)

### A.  Medical Evidence

#### 1.  Injuries Sustained in September 6, 2007, Motor Vehicle Accident: Dr. Joseph Bosco; Dr. Kenneth Egol; and Dr. Munjal Patel

Plaintiff was admitted to Jamaica Hospital on September 6, 2007, with a left hip dislocation, left acetabular fracture, a degloving injury to his left foot, and a Grade IIIA open left fifth metatarsal fracture. (See id. at 191, 193.) On September 7, 2007, Dr. Joseph Bosco performed a closed reduction of the left hip dislocation and applied external fixation ("CREF"), irrigated and debrided the left foot injury of nonviable tissue and foreign material, and performed open reduction internal fixation ("ORIF") of the left fifth metatarsal fracture. (Id. at 193-94.) On September 11, 2007, Dr. Kenneth Egol performed surgery to repair Plaintiff's fractured left hip. (Id. at 196-98.) Several days later, on September 17, 2007, Dr. Munjal Patel, a plastic

surgeon, operated on Plaintiff's left foot to remove necrotic tissue from the wound and apply a split-thickness skin graft harvested from Plaintiff's left thigh. (Id. at 200-01.)

Dr. Patel reviewed Plaintiff's condition before discharging him on September 24, 2007, noting that Plaintiff "was stable, tolerating a regular diet[, and] his skin graft appeared to have taken 100%." (Id. at 214.) Plaintiff was given pain killers and short course antibiotics, as well as crutches with instructions to avoid bearing weight on his left side. (Id.) Plaintiff was instructed to follow up with Dr. Egol and Dr. Patel. (Id.)

In follow-up visits from October 2007 through March 2009, Dr. Egol observed that while Plaintiff was neurologically intact and his injuries had healed, he had chronic pain in the left hip region, had developed a Trendelenberg gait, and required a cane to ambulate. (Id. at 361-70.) On August 12, 2008, Dr. Egol diagnosed Plaintiff with posttraumatic arthritis and prescribed Celebrex to manage inflammation. (Id. at 363.) In examination notes dated October 7, 2008—approximately one year after Plaintiff's accident—Dr. Egol wrote that Plaintiff most likely would not return to his former job in sanitation and "would likely require job retraining and work in a sedentary-type position or [remain] disabled from his job as a result of his accident at work." (Id. at 362.) Dr. Egol also noted that Plaintiff had reached maximum medical improvement for his injury. (Id.) On March 10, 2009, Plaintiff visited Dr. Egol for a worker's compensation follow-up and evaluation. (Id. at 361.) Dr. Egol noted that Plaintiff still used a cane to ambulate one and half years after his accident, and suffered from posttraumatic arthritis in his left hip. (Id.) Dr. Egol referred Plaintiff to Dr. Roy Davidovitch for a possible total hip replacement. (Id.)

3

2. Second Hip Replacement: Dr. Davidovitch; Dr. Nathan; Dr. Karlinsky-Bellini

Plaintiff first saw Dr. Davidovitch on March 24, 2009. (Id. at 360.) At that time, he complained of pain in the left hip and groin region, as well as in the posterior superior lumbar spine. (Id.) Dr. Davidovitch sent Plaintiff for a CT scan for further evaluation. (Id.) On April 21, 2009, Plaintiff again presented with pain in the greater left hip region and posterior superior iliac spine ("PSIS"). (Id. at 358-59.) Dr. Davidovitch noted that Plaintiff walked with an antalgic gait, his left hip flexion was 50 degrees, internal rotation was approximately 20 degrees, and external rotation was 30 degrees.[1] (Id. at 358-59.) Dr. Davidovitch injected Plaintiff with lidocaine to see if his pain would abate. (Id. at 359.)

Plaintiff saw Dr. Davidovitch again on June 2, 2009, this time bringing the results of his CT scan which indicated mild arthritis in the left hip. (Id. at 357, 360.) Plaintiff complained of continued pain in his left hip, left buttock, and PSIS. (Id.) Dr. Davidovitch concluded that if another lidocaine shot in the left hip did not reduce the PSIS pain, then it may be attributable to a source other than the hip injury. (Id.) He noted that a bone scan should be obtained in such a case. (Id.) On September 15, 2009, Plaintiff complained that the lidocaine only alleviated pain in his groin for approximately one week before it returned; the PSIS pain continued to persist. (Id. at 356.) Dr. Davidovitch suggested a total hip replacement and went over the benefits, risks, and alternatives with Plaintiff. (Id.)

On October 10, 2009, Dr. Jay Nathan, an orthopedist, examined Plaintiff for a worker's compensation evaluation. (Id. at 239-44.) Dr. Nathan observed mild tenderness in Plaintiff's left hip with forward flexion limited to 70 degrees. (Id. at 242.) Dr. Nathan also noted mild

---

[1] Normal range of motion for hips includes: forward flexion (90-120 degrees); extension (25-30 degrees); abduction (20-25 degrees); external rotation (50 degrees); and internal rotation (40 degrees). (R. at 334.)

4

tenderness in the left foot, with minimal motion in the toes and decreased sensation. (Id.) Upon examination of Plaintiff's spine, Dr. Nathan found reduced flexion limited by left hip pain, though motor strength and reflexes were normal and a straight leg raising test was negative. (Id.) Dr. Nathan also observed that Plaintiff walked with an antalgic gait, used a cane, and asked for assistance getting on and off the examination table. (Id.) Dr. Nathan noted that Plaintiff had not yet reached maximum medical improvement, and he further concluded that a total left hip replacement was necessary. (Id.) He wrote that Plaintiff "exhibited a moderate degree of disability [and] may work in a sedentary capacity with no lifting greater than 10-lbs." (Id. at 243.)

On January 6, 2010, Dr. Davidovitch performed a total replacement of Plaintiff's left hip at Jamaica Hospital. (Id. at 294-97.) In a follow-up visit on March 2, 2010, Dr. Davidovitch noted that Plaintiff was doing well and had no complaints regarding his hip. (Id. at 354.) Plaintiff did report experiencing lower back pain which he attributed to a recent fall. (Id.) On physical examination, Plaintiff was able to stand on one leg on both the left and right sides, had no Trendelenburg signs, and was told he could discontinue his hip precautions. (Id.) Dr. Davidovitch prescribed Mobic for Plaintiff's back pain. (Id.) By May 2010, Plaintiff was complaining of significant right-sided back pain radiating down the buttock. (Id. at 353.) Dr. Davidovitch noted during a May 25, 2010, visit that Plaintiff may have "chronic sciatica secondary to his primary trauma," and referred him to Dr. Rusty Varlotta for treatment of his back. (Id.) The Record does not indicate whether Plaintiff ever visited Dr. Varlotta in connection with his back pain.

On May 4, 2010, the Division of Disability Determination referred Plaintiff to orthopedist Dr. Victoria Karlinksy-Bellini for a consultative examination. (Id. at 317.) Dr. Karlinsky-Bellini

5

noted that Plaintiff presented with excessively high blood pressure, which he attributed to his lower back pain; he refused to be taken to the emergency room. (Id. at 318.) Upon examination, Dr. Karlinsky-Bellini observed:

> He appears to be in moderate discomfort due to back pain. When asked to walk, he walks with a cane, which was given to him in Jamaica Hospital by an MD. He uses it at all times in order to ambulate and to keep some of the pressure off his back. It appears to be medically necessary in order for him to maintain his balance. He uses it throughout the entire examination. He limps when he walks, favoring his left side. He is unable to walk on his heels or toes. He is unable to squat partially or fully. His station is normal. Needs no help changing for the exam or getting on and off exam table. Able to rise from chair without difficulty.

(Id.) Dr. Karlinsky-Bellini also noted that Plaintiff's movement in the thoracic and lumbar spines and lower extremities was limited due to pain,[2] though he exhibited no sacroiliac or sciatic notch tenderness. (Id. at 319.) She further reported that a straight leg raise test was "limited to 40 degrees bilaterally in supine and sitting positions, due to pain." (Id.) Dr. Karlinksy-Bellini reviewed x-rays of Plaintiff's pelvis and hips, diagnosing him as status-post left hip replacement, but she noted that there was no work-up available to diagnose Plaintiff's lower back pain. (Id.) Dr. Karlinsky-Bellini wrote that "[f]rom a musculoskeletal point of view, sitting, pushing, pulling and reaching are unrestricted. Standing, walking, climbing, bending, and lifting are moderately to severely limited, due to bilateral hip and lower back pain."
(Id. at 320.)

On May 11, 2010, R. Weksberg, a disability examiner, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (Id. at 323-28.) The report asserted that Plaintiff

---

[2] Regarding Plaintiff's spine movement, Dr. Karlinsky-Bellini reported: "Flexion limited to 40 degrees due to pain, extension limited to 10 degrees due to pain, lateral flexion limited to 10 degrees bilaterally due to pain, and side [sic] side-to-side rotation limited to 10 degrees bilaterally due to pain. . . . Flexion of the hips is limited to 40 degrees on the right and 60 degrees on the left due to pain." (R. at 319.)

could lift a maximum of 10 pounds, stand and/or walk two hours in an eight-hour workday (with normal breaks), sit six hours in an eight-hour workday (with normal breaks), and had an unlimited ability to push or pull (excepting the limits on his ability to lift). (Id. at 324.) The report recommended that Plaintiff should never climb, balance, stoop, kneel, crouch, or crawl due to a reduced range of motion and pain. (Id. at 325.) Weksberg noted that Plaintiff's "problems lifting heavy items due to back pain are credible. Hip instability rectified by hip replacement." (Id. at 327.)

In July 2010, Plaintiff dislocated his left hip twice: once, while bearing weight in the shower, and again while sitting on a low beanbag-type chair. (Id. at 352.) He was admitted to Jamaica Hospital for a closed reduction of the joint and fitted with an abduction brace. (Id.) On August 24, 2010, Dr. Davidovitch reported that Plaintiff felt a loss of confidence in the security of his left hip and requested continued use of the brace. (Id. at 351.) Dr. Davidovitch agreed to allow Plaintiff to use the brace for another month. (Id.) In a follow-up visit on September 21, 2010, Dr. Davidovitch observed that Plaintiff had stopped using the leg brace and was feeling significantly better, though he still experienced occasional pain, walked with an antalgic gait, and used a cane. (Id. at 350.) Dr. Davidovitch noted that Plaintiff was still disabled by his injury and that he would "continue physical therapy and follow-up with [Plaintiff] in three months." (Id.)

> 3. Medical Evidence After January 11, 2011: Dr. Davidovitch; Dr. Ross; Dr. Donadt

Plaintiff visited Dr. Davidovitch again on January 11, 2011, six months after dislocating his hip. (Id. at 349.) Dr. Davidovitch noted that Plaintiff had missed several appointments. (Id.) Plaintiff had no new issues with his hip, but he complained of continued lower back pain. (Id.) Dr. Davidovitch referred Plaintiff to Dr. Donadt for the chronic back pain. (Id.)

On July 6, 2011, Dr. Stanley Ross examined Plaintiff for a worker's compensation carrier evaluation. (Id. at 331.) Plaintiff reported that he was able to sit or stand for 30 minutes before needing to change positions due to pain. (Id. at 332.) Additionally, Plaintiff reported that he was "unable to garden, drive, sweep, tie his shoes, cook, or attend to his personal hygiene." (Id. at 333.) Dr. Ross noted that Plaintiff used a cane and special brace for sitting. (Id. at 334.) Examination of the lumbar spine was normal; range of motion in the left hip was limited. (Id.) Dr. Ross noted: "Mr. Pharr['s] condition has reached maximum medical improvement in my specialty, Orthopedics. Administering physical therapy would be considered palliative and not of curative benefit at this point. I suggest this claimant continue the use of a cane and hip brace for assistance." (Id. at 335.) Dr. Ross concluded from the examination and Plaintiff's medical records that there was a causal relationship between Plaintiff's 2007 accident and the reported lumbar spine and left hip injuries. (Id.) He agreed with Dr. Davidovitch that Plaintiff was disabled from his current employment as a truck driver, but he concluded that Plaintiff was "capable of seeking employment performing very minimal sedentary duties." (Id.)

On August 1, 2011, Dr. Davidovitch completed an assessment of Plaintiff's ability to do work-related activities. (Id. at 340-43.) He noted that Plaintiff was limited to lifting or carrying less than 10 pounds, and that he could sit, stand, and walk for less than two hours in an eight-hour work day. (Id.) Dr. Davidovitch also reported that Plaintiff could sit or stand for 10 minutes before needing to change positions to relieve discomfort. (Id.) He cautioned that Plaintiff should never crouch or climb ladders and should only occasionally twist, stoop, bend, and climb stairs. (Id. at 342.) He also reported that Plaintiff should avoid all exposure to extreme heat and cold, wetness, humidity, fumes, dusts, gases, poor ventilation, and other hazards such as machinery. (Id. at 343.) Finally, he anticipated that Plaintiff's impairments or

8

treatment would cause him to be absent from work more than three times a month. (Id.) Dr. Davidovitch concluded that Plaintiff was able to perform less than sedentary work.[3] (Id. at 340.)

On August 30, 2011, Dr. Davidovitch completed another report assessing whether Plaintiff's condition met or equaled the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02A[4] ("Listing 1.02A"). (Id. at 344-45.) Dr. Davidovitch identified Plaintiff's left hip replacement and dislocations as dysfunctions of the left hip under Listing 1.02A. (Id. at 344.) He further reported that Plaintiff was affected by chronic joint pain and stiffness and suffered from limited range of motion in the left hip. (Id.) Dr. Davidovitch noted that Plaintiff was unable, on a sustained basis, to walk a block at a reasonable pace on rough or uneven surfaces without companion assistance. (Id. at 345.) He also noted that Plaintiff was unable to climb stairs at a reasonable pace using a single hand rail or get into or out of a bus without companion assistance. (Id.) Dr. Davidovitch noted that Plaintiff needed a cane to ambulate. (Id.) However, Plaintiff was able to "carry out routine ambulatory activities including grocery and clothes shopping and banking." (Id.)

---

[3] Dr. Davidovitch's report defined "sedentary work" as:

> Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(R. at 340 (emphasis in original).)

[4] Musculoskeletal System Listing Section 1.02A of 20 C.F.R. Part 404, Subpart P, Appendix 1 requires:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: [] Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively.

Plaintiff visited Dr. Davidovitch on November 22, 2011, complaining of pain in his left hip and lower back. (Id. at 407.) Dr. Davidovitch noted that while Plaintiff had no instability in his hip, the back pain is a "major component of his pain [and] is really disabling for him." (Id.) Dr. Davidovitch noted that Plaintiff had been seen by Dr. Donadt and that his work-up was pending. (Id.)

A December 7, 2011, MRI report of Plaintiff's lumbosacral spine addressed to Dr. Donadt indicated:

> [D]iscogenic degenerative changes at the L5-S1 level. This includes loss of height of the disc with disc dislocation, endplate changes and some associated marginal osteophytes. There are lesser discogenic changes at the L1-2, L3-4 and L4-5 levels. There is some anterior marginal osteophyte noted at the L2-3 level, as well.
>
> There is posterior disc bulge at the L2-3 level favoring the right side. This is encroaching upon the ventral aspect of the thecal sac and later recesses bilaterally with the right side greater than the left as well as the inferior aspects of the neural foramina bilaterally with the right side greater than the left.
>
> There is posterior disc bulge at the L3-4 level encroaching upon the ventral aspect of the thecal sac and lateral recesses bilaterally.
>
> There is a central posterior disc herniation at the L4-5 level extending a few millimeters inferiorly at the midline. This is encroaching upon the ventral aspect of the thecal sac and lateral recesses bilaterally.

(Id. at 408.) No interpretive or examination notes from Dr. Donadt are included in the Record. On January 17, 2012, Dr. Davidovitch again noted that Plaintiff still complained of lower back pain, and he suggested that Plaintiff was disabled from his occupation. (Id. at 409.)

**B.     Other Evidence**

In Plaintiff's hearing before the Administrative Law Judge (the "ALJ") on

August 17, 2011, he testified that his wife helps him get in and out of the shower and put on his pants and Velcro sneakers. (Id. at 54-55.) When asked about his daily activities, Plaintiff stated that he no longer helps his wife with laundry and while he accompanies her shopping he does not lift anything. (Id. at 55.) He testified that he spends his days sitting on the porch, speaking with neighbors, reading books, watching TV, and calling family members. (Id. at 63.) Plaintiff said that he does these activities while seated or lying down. (Id.) He stated that he always uses a cane to walk (id. at 51), and that he wears a hip brace when venturing outside his home (id. at 50). Plaintiff testified that when he needs to travel for errands or doctor visits his friends and family drive him in a van, which he reported was easier for him to get into than a regular car. (Id. at 66.) He sometimes takes the bus. (Id. at 63.) Plaintiff testified that 90 percent of the time he travels with someone else. (Id. at 65.) Plaintiff stated that he frequently needs to change positions due to pain and stiffness. (See id. at 66.) During the hearing, Plaintiff twice indicated that he needed to stand up from his seat. (See id. at 53, 65.)

The ALJ also questioned vocational expert Jay Steinbrenner during the hearing. (See id. at 66-69.) Steinbrenner confirmed that Plaintiff's previous job as a garbage collection truck driver was classified as semi-skilled, medium exertion level, his role as a garbage collector was unskilled, very heavy exertion level, and his former occupation as a bus driver was semi-skilled, light to medium exertion depending on the frequency and weight of handicapped passengers. (Id. at 68-69.)

## II.    PROCEDURAL HISTORY

On November 30, 2009, Plaintiff filed an application for disability insurance benefits with the SSA for disabilities stemming from his September 6, 2007 car accident. (See id.

at 144-47.) The SSA denied his application on May 12, 2010. (Id. at 73). Plaintiff then requested a hearing before an ALJ. (Id. at 78). On August 17, 2011, Plaintiff, represented by counsel, appeared and testified before ALJ Gal Lahat. (Id. at 42.) The ALJ issued a partially favorable decision on February 23, 2012, granting Plaintiff disability benefits for the period from September 6, 2007, through January 10, 2011, but not thereafter. (See id. at 22-35.) The ALJ determined that on January 11, 2011, Plaintiff exhibited "medical improvement . . . related to the ability to work, and . . . [t]hus, the claimant's disability ended on January 11, 2011." (Id. at 23.) On April 23, 2012, Plaintiff requested that the SSA Appeals Council review the unfavorable portion of the ALJ's decision. (Id. at 15.) The Appeals Council denied the request for review on August 16, 2013. (Id. at 1-7.) Accordingly, the ALJ's February 23, 2012, decision became the final decision of the Commissioner. (Id.) Plaintiff subsequently initiated this action seeking review of the ALJ's decision.

## III. THE ALJ'S DECISION

The ALJ issued a partially favorable decision in Plaintiff's case on February 23, 2012. (Id. at 35.) Following the SSA's five-step procedure to evaluate Plaintiff's claim, the ALJ found that (1) Plaintiff had not engaged in substantially gainful activity since September 6, 2007, the date of his car accident; (2) from September 6, 2007, to January 10, 2011, Plaintiff had severe impairments including obesity, a history of left hip posttraumatic arthritis with acetabular fracture, status post left hip arthroscopy and degenerative disc and joint disease of the lumbar spine; and (3) during that same period, the severity of Plaintiff's left hip impairment met the criteria of Listing 1.02A. (Id. at 25-30.) "Since an impairment that meets or equals the requirements of a listed impairment is per se disabling, [the ALJ concluded that] a favorable

decision [was] warranted" as defined by the Social Security Act, and she ended her analysis at step three. (Id. at 30.)

The ALJ also concluded, however, that Plaintiff's disability was limited to the closed period from September 6, 2007, through January 10, 2011. (Id. at 31.) The ALJ found that beginning January 11, 2011, Plaintiff exhibited medical improvement in his hip impairment and thus could no longer satisfy the disability criteria of Listing 1.02A, or any other listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 31.) The ALJ relied on the medical reports of Plaintiff's treating physician, Dr. Davidovitch—from January 11, 2011—and worker's compensation consultant, Dr. Ross—from July 6, 2011—to make this determination, noting that Plaintiff's "left hip impairment [was] largely resolved and that he is no[w] capable of effective ambulation." (Id.)

The ALJ also found that Plaintiff's back impairment did not meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A ("Listing 1.04A"), citing a lack of the "requisite neurological abnormalities" in the medical record. (Id.) The ALJ noted that with regard to Plaintiff's back pain, "no formal diagnosis has been achieved by either treating or consultative examiner to explain [the] symptom, [and] while on MRI a disc herniation was found, [there was no] compression of the spinal cord or any exiting nerve." (Id. at 32-33.) The ALJ gave very little probative weight to the November 11, 2011, medical opinion of Dr. Davidovitch—in which Dr. Davidovitch concluded that Plaintiff was disabled because of his back pain—citing the contradicting reports of Dr. Ross, Dr. Karlinsky-Bellini, and Dr. Nathan. (Id. at 33.)

Regarding Plaintiff's residual functional capacity, the ALJ concluded that while Plaintiff was unable to perform his past relevant work as a garbage collector and truck driver—work classified by the vocational expert at the hearing as semi-skilled and of medium to very heavy

exertion—he nonetheless "[retained the] residual functional capacity for less than the full range of sedentary work." (Id. at 34.) Using Medical-Vocational Rule 201.21—also known as "the grids"—as a framework, and considering Plaintiff's age, education, and work experience, the ALJ found that Plaintiff's need to use a cane when walking, and limited ability to crouch, crawl, or stoop had "little to no effect on the occupational base of unskilled sedentary work." (Id.) See also 20 C.F.R. Part 404, Subpart P, Appendix 2. Finally, the ALJ concluded that Plaintiff is "not disabled" and that "there have been jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." (R. at 34.)

## IV.    LEGAL STANDARD

### A.    Review of Final Determinations of the Social Security Administration

Under Federal Rule of Civil Procedure 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [he] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

## B.    Determination of Disability

### 1.    Initial Five-Step Analysis of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Social Security Act if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Social Security Act. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the

claimant's impairments meet or equal the "Listing of Impairments" set forth in . . . the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (citations omitted).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks and citation omitted). However, if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show there is other gainful work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

2.    The Treating Physician Rule

According to SSA regulations, the opinions of treating physicians are afforded controlling weight because they are more likely to be "able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The regulations require an ALJ to give controlling weight to the medical opinion of a treating physician if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When an ALJ declines to give controlling weight to the opinion of a treating physician, the ALJ is required to assess several factors to determine how much weight to give the opinion. These factors include:

> (1) length of treatment relationship and frequency of examination;
> (2) nature and extent of the treatment relationship; (3) the degree of
> explanation given in the opinion; (4) consistency with the record as
> a whole; (5) specialization; [and] (6) other factors such as the
> treating physician's familiarity with disability programs and with
> the case record.

20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), 404.1527(c)(3)-(6).

In short, the ALJ must provide "good reasons" for discounting a treating physician's opinion. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a

treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Finally, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion[, and while] an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a [treating] physician." Balsamo, 142 F.3d at 81.

### 3. Duty to Develop the Administrative Record

"The ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Carroll, 705 F.2d at 642. The ALJ must develop the claimant's medical history, even where extant clinical findings are inadequate and the claimant is represented by counsel. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). "[M]oreover, . . . an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79.

### 4. Determining Whether a Disabling Condition Continues

"Once a claimant establishes the existence of a disabling condition, [he] is entitled to a presumption that the classification will not change unless the condition, governing statutes, or regulations change." Carbone v. Astrue, No. 08-CV-2376 (NGG), 2010 WL 3398960, at *12 (E.D.N.Y. Aug. 26, 2010); see also De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 937 (2d Cir. 1984). As such, when an ALJ determines that the disabling condition only exists for a closed period, she must demonstrate that substantial evidence supports a finding of medical improvement related to the claimant's ability to perform substantially gainful activity.

See Nascimento v. Colvin, 90 F. Supp. 3d 47, 53 (E.D.N.Y. 2015). SSA regulations define medical improvement as "any decrease in the medical severity of [the claimant's] impairment which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." Id.

"In order to determine whether medical improvement has occurred, [the ALJ] must compare the current medical severity of the impairment to the medical severity of that impairment at the time of the most recent favorable medical decision." Veino v. Barnhart, 312 F.3d 578, 586-87 (2d Cir. 2002) (internal citations, quotation marks, and alterations omitted); see also 20 C.F.R § 404.1594(b)(7). In a closed period case such as this, the time of the most recent favorable medical decision—or "point of comparison"—is the onset date of the disability. See, e.g., Carbone, 2010 WL 3398960, at *13; Chavis v. Astrue, No. 07-CV-0018 (LEK) (VEB), 2010 WL 624039, at *8 (N.D.N.Y. Feb. 18, 2010). If medical improvement is found, the ALJ must show that it is related to the claimant's ability to do work. 20 C.F.R § 404.1594(c)(2). However, where, as in this case, the most recent favorable decision was based on the claimant's impairment meeting or equaling the severity of a listed impairment, medical improvement is considered related to the ability to do work if the claimant's impairment no longer meets or equals the same listed impairment used in the most recent favorable decision. Id. § 404.1594(c)(3)(i). If the residual impairments are nonetheless severe,

> [T]he [claimant's] current [residual functioning capacity] must be assessed based on all current impairments. As in an initial [five-step] determination, [the claimant's] current [residual functioning capacity] will be compared to [his] past relevant work in order to determine if [he] can perform this work. If the [residual functioning capacity], age, education and work experience do not permit [the

claimant] to perform past relevant work, a determination will be made as to whether there is other work in the national economy that [he] can do. If such work exists, the claimant's disability will have ended."

Nascimento, 90 F. Supp. 3d at 54 (internal quotation marks and citation omitted).

## V.    DISCUSSION

Plaintiff argues that the ALJ erred in denying continued benefits, by: (1) failing to provide substantial evidence for finding that as of January 11, 2011, Plaintiff's impairment no longer met or equaled the requirements of a listed impairment in the SSA regulations; (2) finding that Plaintiff had the residual functional capacity for the full range of sedentary work; (3) improperly assessing Plaintiff's credibility; and (4) failing to sustain its burden of showing that there is work in the national economy that Plaintiff can perform. (Pl.'s Mem. at 10-25.) As explained below, the court finds that the ALJ correctly found that Plaintiff experienced medical improvement such that Listing 1.02A was no longer met. However, the court finds that the ALJ nonetheless erred in her evaluation of Plaintiff's residual function capacity and improperly assessed Plaintiff's credibility. Accordingly, remand is warranted, and the court need not reach Plaintiff's fourth and final argument.

### A.    Medical Improvement Beginning January 11, 2011

In comparing the medical severity of Plaintiff's hip impairment in 2011 to the medical severity as of the onset date, September 6, 2007, the Record clearly demonstrates substantial evidence from a treating physician to support a finding of medical improvement. On January 11, 2011, medical notes from Dr. Davidovitch, Plaintiff's treating physician, indicate that Plaintiff had "missed numerous appointments," and reported "no issues with his hip." (R. at 391.) In examination notes dated September 20, 2011, Dr. Davidovitch noted that Plaintiff had "no complaints regarding his hip. He is almost completely pain-free in that region. . . . With

20

regards to his hip, there is no further intervention at this time. On this office visit, he is neurovascularly intact. He is able to toe and heel walk and denied any bowel or bladder incontinence." (Id. at 390.) On November 22, 2011, Dr. Davidovitch noted that Plaintiff "had no instability in the hip and he is able to ambulate. . . . On physical exam, his hip flexion is to 90 degrees, internal rotation 20, and external rotation 30. He has got no apprehension and no signs of instability." (Id. at 407.) In short, as of January 11, 2011, Plaintiff no longer routinely complained of hip pain, with the majority of his pain coming almost exclusively from his lower back. Moreover, upon examination Plaintiff demonstrated stability in the left hip joint that had been lacking in the past and had resulted in two dislocations. (Id.) Accordingly, the medical evidence after January 10, 2011, supports the ALJ's conclusion that Plaintiff experienced medical improvement with respect to the severity of his hip impairment.

## B. Evaluation of Plaintiff's Residual Functional Capacity

In evaluating Plaintiff's residual functioning capacity, the ALJ focused on Plaintiff's current impairments, finding that he was unable to perform his former work as a truck driver and garbage collector, but was still capable of sedentary work. (Id. at 32-34). The court finds that remand is appropriate here because the ALJ improperly weighed the medical evidence, failed to develop the record, and improperly substituted her own interpretation of medical evidence for that of a treating physician.

### 1. Weight Given to Dr. Davidovitch's Opinion

The ALJ gave "very limited probative value" to Dr. Davidovitch's opinion that Plaintiff was disabled due to back pain, stating that such an opinion was "uncorroborated." (Id. at 33.) The ALJ found that Dr. Davidovitch's opinion contradicted the findings and conclusions of consulting medical examiners as well as Dr. Davidovitch's own records. (Id.) Specifically, the

ALJ cited the November 2011 medical report—in which Dr. Davidovitch noted that Plaintiff could walk on his toes and heels and that he was neurologically intact—as well as the consulting reports of Dr. Ross, Dr. Karlinsky-Bellini, and Dr. Nathan—medical examiners that Plaintiff saw only once—as evidence which conflicted with Dr. Davidovitch's opinion. (Id.) The ALJ noted:

> Dr. Ross reported no neurological abnormalities. Dr. Karlinksi-Bellini [sic] reported that the claimant had moderate back discomfort and loss of spinal range of motion. However, she also reported no loss of motor power, sensation or reflexes. She concluded that the claimant was not limited for sitting. Dr. Nathan reported that the claimant's lumbar motion was reduced secondary to hip pain, not back pain. No physician has reported . . . spasms or positive straight leg raising.

(Id.) Beyond noting that the reports of other physicians contradicted Dr. Davidovitch's opinion, the ALJ did not address any of the factors prescribed by the SSA regulations in assessing the weight to give Dr. Davidovitch's opinion. See 20 C.F.R. § 494.1527(c)(2)-(6); Floyd v. Colvin, No. 13-CV-4963 (NGG), 2015 WL 2091871, at *8 (E.D.N.Y. May 5, 2015) ("It is not enough for the ALJ to simply say that a treating physician's findings are unsupported by the record; the ALJ must provide reasons which explain that inconsistency with the other parts of the record." (internal quotation marks and citation omitted)).

In deciding to give limited weight to Dr. Davidovitch's medical opinion, the ALJ instead gave "considerable probative weight" to the opinion of Dr. Ross, stating that "Dr. Ross's assessment that the claimant is not precluded from all work due to either hip or back pain is corroborated by both his own findings on examination as well as by the medical record as a whole." (Id.) The ALJ did not adequately explain why the opinion of Dr. Ross, a consulting medical examiner who saw Plaintiff only once, was more convincing than the opinion of Dr. Davidovitch, who had treated Plaintiff since 2009. See Floyd, 2015 WL 2091871, at *8; Crespo v. Apfel, No. 97-CV-4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999) ("In

22

making a substantial evidence evaluation, a consulting physician's opinion or report should be given limited weight. [C]onsultative examinations are . . . often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day.").

Moreover, with regard to Plaintiff's ability to do work, the opinions of Dr. Ross and Dr. Davidovitch do not appear to be in direct contradiction. Dr. Ross noted that although "[Plaintiff] is unable to work as a truck driver . . . he is capable of seeking employment performing very minimal sedentary duties." (Id. at 335.) In his own assessment of Plaintiff's ability to do work, Dr. Davidovitch similarly noted that Plaintiff could perform "less than sedentary" work. (Id. at 340.) In fact, nothing in the report of Dr. Ross affirmatively contradicts the assessment of Plaintiff's residual functional capacity offered by Dr. Davidovitch.[5] The ALJ neither addresses the similarities nor adequately explains the contradictions between the two reports. In short, the ALJ did not provide "good reasons" for giving the opinion of Dr. Davidovitch very limited weight.

## 2.    Dr. Donadt's Absent Medical Records

Even if the ALJ had provided "good reasons" for not giving controlling weight to the opinion of Dr. Davidovitch's, remand is warranted to complete the record as it relates to the severity of Plaintiff's back condition. In this case, the Record extensively documents the history of Plaintiff's accident and hospitalization (id. at 187-237), hip surgeries (id. at 196-98, 294-97, 352), and visits with his treating orthopedist, Dr. Davidovitch (id.

---

[5] Dr. Ross's report does not provide a range of limitations related to the ability to do work, such as the ability to sit and stand for periods of time and lift various weight loads, which Dr. Davidovitch's report does include. As far as an assessment of Plaintiff's ability to do work, Dr. Ross only stated that Plaintiff could not perform his previous job, but could perform "very minimal sedentary duties." (See R. at 331-37, 340-43.)

23

at 349-60, 390-409). The Record also documents the progression of Plaintiff's back condition, from the first time Plaintiff complained of lower back pain on March 24, 2009 (id. at 360), his continued complaints of back pain from 2009 through 2011 (id. at 317-18, 349, 353-54, 356-60, 390, 407, 409), his referral to Dr. Donadt by Dr. Davidovitch (id. at 349, 407), and finally, his MRI report (id. at 408). In medical notes from November 22, 2011, Dr. Davidovitch wrote that Plaintiff had been seen by Dr. Donadt and that his work-up was pending. (Id. at 407.) However, the Record does not contain any of Dr. Donadt's treatment notes or interpretive notes from the MRI that he ordered for Plaintiff. (See Pl.'s Mem. at 13, n.4.) Moreover, while a copy of the December 7, 2011, MRI report was included in the Record (R. at 408), there is no indication that the ALJ attempted to obtain any medical opinions or notes from Dr. Donadt, although she was aware that no other physician had made a formal diagnosis regarding Plaintiff's back pain (id. at 32), and that Plaintiff had visited Dr. Donadt at the recommendation of his long-time orthopedist, Dr. Davidovitch (id. at 349).

Despite this gap in the Record, the ALJ seems to have interpreted Plaintiff's MRI report on her own, concluding that "a frank disc herniation has not resulted in spinal cord or nerve root compression." (Id. at 33.) Plaintiff argues that the ALJ misread the MRI. (Pl.'s Mem at 13; see R. at 408.) However, the question of whether the ALJ correctly deciphered the report from the radiology center is separate from the question of whether such a lay interpretation was proper. The Second Circuit has stated that "[t]he ALJ is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015); see also Shaw, 221 F.3d at 134-35 (2d Cir. 2000). In the absence of Dr. Donadt's records, and given the lingering question of Plaintiff's ongoing back pain, it was improper for the ALJ to draw her own conclusions as to the

severity of Plaintiff's back condition. See Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings."); Dusharm v. Colvin, No. 14-CV-1562 (GTS) (WBC), 2016 WL 1271490, at *5-6 (N.D.N.Y. Mar. 31, 2016) (finding that the ALJ impermissibly relied solely on her own lay interpretation of an MRI and other medical evidence).

## C. Assessment of Plaintiff's Credibility

Next, Plaintiff argues that the ALJ improperly evaluated his subjective statements "concerning the intensity, persistence and limiting effects of [his] symptoms" after January 10, 2011. (Pl.'s Mem. at 30.) The ALJ concluded that Plaintiff's statements were "not wholly credible beginning January 11, 2011, to the extent they are inconsistent with the overall evidence." (Id. at 32.) The ALJ based this finding largely on the medical improvement in Plaintiff's hip, as documented by Dr. Davidovitch throughout 2011. (Id.) However, as the ALJ reached this conclusion without reviewing Dr. Donadt's records and after failing to correctly evaluate the existing medical evidence, remand is appropriate. See Rosa, 168 F.3d at 82 n.7 (noting that the court cannot accept the ALJ's decision regarding the plaintiff's credibility in light of the need to develop evidence on remand); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) (declining to consider plaintiff's credibility argument because development of the record on remand would affect the ALJ's credibility determination). On remand, the ALJ is directed to evaluate Plaintiff's credibility in light of the medical records from Dr. Donadt and the re-evaluated medical opinion of Dr. Davidovitch.

## D. Reliance on Medical-Vocational Guideline 201.21

In the final step of her analysis, the ALJ relied on Medical-Vocational Guideline 201.21—the grids—to conclude that Plaintiff was not disabled. (R. at 34.)

Specifically, the ALJ found that Plaintiff's additional limitations—his inability to stoop, crouch, or crawl as well as his need to use a cane—did "not significantly impact" his ability to perform sedentary work. (Id.) Plaintiff argues that the ALJ erred in relying exclusively on the grids and ignoring the effect these limitations have on Plaintiff's ability to do the full range of sedentary work. (Pl.'s Mem. at 24.)

Because the ALJ erred in her analysis of Plaintiff's residual functional capacity, as discussed above, the court need not decide the issue of the ALJ's exclusive reliance on the grids. However, the court notes that "where significant nonexertional impairments are present at the fifth step in the disability analysis . . . 'application of the grids is inappropriate.' Instead, [the ALJ] 'must introduce testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which the claimant can obtain and perform.'" Rosa, 168 F.3d at 82 (quoting Bapp v. Bowen, 802 F.2d 601, 603, 605-06 (2d Cir. 1986)); see also Carbone, 2010 WL 3398960, at *18 (noting that the ALJ acknowledged the grids are applied differently to nonexertional and exertional limitations, but ultimately failed to provide any discussion of the plaintiff's nonexertional limitations).

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is
DENIED, Plaintiff's cross-motion for judgment on the pleadings in GRANTED, and this case is
REMANDED to the SAA for further development of the Record, a proper evaluation of the
medical opinions, and a renewed evaluation of Plaintiff's subjective complaints in light of all the
medical evidence.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      August ⌊, 2016

NICHOLAS G. GARAUFIS
United States District Judge